# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CARLOS ANTONIO RILEY, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **1:16CV127** |
| v. | ) | **1:13CR122-1** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner Carlos Antonio Riley, Jr., a federal prisoner, has brought a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (Docket Entry 43.) Petitioner was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and of possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2). (Docket Entry 1.) Petitioner pled guilty to the former charge and, pursuant to a plea agreement, the latter charge was ultimately dismissed. (Docket Entries 17-18, 27; Docket Entry 36 at 40; Minute Entry 7/3/2013.) Petitioner was sentenced to 120 months of imprisonment. (Docket Entry 27; Minute Entry 3/20/2014.) His appeal was unsuccessful. *See United States v. Riley*, 600 F. App'x 869 (4th Cir. 2015). Petitioner next filed the instant motion (Docket Entry 43), a memorandum in support (Docket Entry 44), a supplement (Docket Entry 46), an additional memorandum (Docket Entry 47), and a motion for the appointment of counsel (Docket Entry 50). The Government then filed a response (Docket Entry 57) and Petitioner filed a reply (Docket Entry 61). The Court next ordered additional briefing regarding issues raised in that reply (Docket Entry 66), to which the Government filed

a response (Docket Entry 68) and to which Petitioner, in turn, filed a motion for an evidentiary hearing (Docket Entry 70). This matter is now ready for a ruling. *See* Rule 8, Rules Governing Section 2255 Proceedings.

## Factual Background

The following facts are taken from the findings made by the Court at sentencing. (Docket Entry 36 at 11-14.) They were supported by the testimony of Durham Police Department employees Officer Kelly Stewart (Docket Entry 24; Docket Entry 35 at 7-17) and Corporal Thomas McMaster. (Docket Entry 35 at 17-53.) The Court found their testimony to be credible and found the following (Docket Entry 36 at 11):

> That on December 18, 2012, Officer Stewart was on patrol on Broad Street near Guess Road, [and he] observed a person later determined to be the defendant outside of a passenger vehicle; and as the vehicle sped off and, according to the officer, going sideways, the officer put his lights on and stopped the vehicle at the entrance of some apartments, approached the driver's side, and talked with the defendant, who he observed to be nervous with his heart beating and sweating.

> He asked whether there was anything in the car he should be aware of, directed the defendant out, and asked if the defendant had anything on his person. The defendant answered no to those and retrieved his license and registration, which was put on the roof of the car.

> The defendant then returned back in the vehicle. The officer told the defendant he was not free to leave, and the defendant did not comply with the commands. The officer reached in the vehicle, and the defendant revved up the engine. The car moved forward. The struggle ensued where the vehicle started moving down the road in the approximate speed of 20 miles an hour. The officer commanded the defendant to stop. The defendant did not stop.

-2-

The officer was able to get inside the vehicle to pull the handbrake. He struck the defendant. The defendant fought back, struck the officer. The officer commanded the defendant to stop resisting. The officer tried to take the defendant into custody, reached for his handcuffs. The defendant said, quote, hell no, closed quote, and knocked the handcuffs away. In the ensuing struggle, the officer's badge, which was hanging around his neck on a chain, was grabbed by the defendant, and it was ripped off.

The struggle ensued. The officer directed the defendant to stop resisting. The defendant did not. The officer then pulled his service revolver and told the defendant he needed to get back. The defendant did not comply. He told him if he didn't get back, he would shoot him. The defendant did not comply. He lunged for the gun. There was a scuffle over the firearm, and it discharged, striking the officer in his leg, in his right thigh.

The officer tried to keep possession of the gun. The defendant wrestled the gun from the officer. He released the magazine button, which discharged the magazine, ejected the round in the chamber, pulled the gun from the officer; and then when he had control of the firearm, the defendant replaced the magazine and chambered a round and pointed it at the officer, who then said, "Please don't shoot me." The defendant said, "I can't believe you tried to shoot me," and the defendant told the officer to get out of the vehicle.

The defendant had the gun in his right hand. The officer indicated he was shot, and so the defendant either pulled or assisted the officer in getting out of the vehicle with his left hand. The officer had with him two cell phones, his work cell phone in his pants pocket and his personal cell phone, which was charging inside his vehicle. The officer was not in uniform but did have his badge which indicated that he was a police officer, and the defendant then drove off. The officer called for assistance.

The defendant left with the officer's badge and his handcuffs and took the officer's firearm. The firearm has never been found. While Mr. Riley was in custody, he was Mirandized and interviewed, and he did say that the officer had attacked him. The defendant admitted taking the badge, the handcuffs, and said that he had thrown the gun in the woods at the scene. Despite

-3-

searching, the gun has not been found. The cell phone was found on the road on Stadium Drive in between two apartment complexes.

. . . .

I will add that when the defendant began to drive his vehicle from the scene, just before the officer reached into the vehicle to try to stop it, that the defendant was revving his engine, and then he began to drive away.

There is also evidence of the defendant's cell phone, which indicates communications with others that is supportive of the fact that the defendant left with the officer's firearm, and the defendant had asked a third party to retrieve firearms.

(*Id.* at 11-14.)

## Petitioner's Grounds for Relief

Petitioner raises two grounds for relief in his motion and many sub-grounds for relief.

(Docket Entry 43.) First, Petitioner contends that he is actually innocent of possession of a

firearm by a convicted felon. (*Id.*, Ground One.) More specifically, he states:

Actual innocence. I would not have been in possession of a weapon if the officer had not jumped into my car and attacked me. I did not attack him. Officer threatened to shoot me, pointed gun at me, had his finger on the trigger. The gun discharged when we wrestled over it and he admitted he shot himself, but the court never knew this because exculpatory evidence was not presented to the court. Taking the gun was self-defense. If I did not take the gun, he probably would have shot me as I was leaving.

(*Id.*)

Petitioner's second ground for relief assets ineffective assistance of counsel. (*Id.*,

Ground Two.) More specifically, he states:

-4-

> Ineffective representation. Lawyer did not present to the court any exculpatory evidence that was available. Lawyer did not call expert on police procedures to testify, although he knew the expert was walking in the court's witness room. Lawyer did not cite any case law to support my defense.

(*Id.*) As explained below, these ground lacks merit.[1]

## <u>Discussion</u>

Although Petitioner only raises two general grounds for relief, he also alleges many sub-arguments as to each general ground, a number of which assert ineffective assistance of counsel. Throughout the remainder of this Recommendation, whenever Petitioner asserts ineffective assistance of counsel, the following legal standard applies.

To prove ineffective assistance, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668, 688, 691-92 (1984). A petitioner bears the burden of showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). To establish prejudice, a petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. To show prejudice when challenging a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would have not pled guilty but would have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The court must determine whether "a decision

---

[1] The undersigned has attempted to respond to all of the many variations of Petitioner's grounds and sub-grounds for relief. To the extent that any have not been specifically discussed, they should still be denied for essentially the reasons set out herein.

-5-

to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010) (citing *Roe v. Flores–Ortega*, 528 U.S. 470, 480, 486 (2000)). This determination is an objective one which is "dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007).

Claims of ineffective assistance of counsel on appeal are also judged using the *Strickland* test. *See Lawrence v. Branker*, 517 F.3d 700, 708–09 (4th Cir. 2008). Appellate counsel need not raise on appeal every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 752–53 (1983); *see also Evans v. Thompson*, 881 F.2d 117, 124 (4th Cir. 1989). Ineffective assistance of appellate counsel can be shown by demonstrating that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Bell v. Jarvis*, 236 F.3d 149, 180 (4th Cir. 2000) (citation omitted). As discussed herein, Petitioner's assertions of ineffective assistance are without merit.

## Ground One

### A. Petitioner Has Failed to Demonstrate His Actual Innocence.

Petitioner contends that he is actually innocent of possession of a firearm by a convicted felon. (Docket Entry 43, Ground One.) A considerable obstacle to this claim is Petitioner's guilty plea to this charge. This is because a valid guilty plea constitutes admission of the material elements of the crime. *McCarthy v. United States*, 394 U.S. 459, 466 (1969); *United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993). The plea is itself a conviction of the offense charged. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged,

-6-

he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was incompetent." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Consequently, unless Petitioner's guilty plea was somehow flawed in this respect, his claim of actual innocence fails.

Here, Petitioner's guilty plea was entered into both knowingly and intelligently. Where, as here, "a defendant is represented by counsel when making his guilty plea, that plea is presumed valid when later attacked in a habeas corpus proceeding. [T]o rebut that strong presumption of validity, the defendant must make a factual showing that his plea of guilt was not voluntary and intelligent." *United States v. Custis*, 988 F.2d 1355, 1363 (4th Cir. 1993) (citations omitted). "[S]tatements of fact by a defendant in Rule 11 proceedings may not ordinarily be repudiated, and, similarly, findings by a sentencing Court in accepting a plea constitute a formidable barrier to attacking the plea." *United States v. Wilson*, 81 F.3d 1300, 1308 (4th Cir. 1996) (citations, quote marks omitted). Absent "extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005).

Here, Petitioner's plea was knowing and voluntary. During his change of plea hearing, Petitioner was under oath. (Docket Entry 33 at 3.) Petitioner told the court that he understood the indictment (*id.* at 5), that he had fully discussed the charges with his attorney (*id.*), that he

had sufficient time to consult with his attorney (*id.*), that he was fully satisfied with his attorney's services (*id.*), and that he had fully explored with his attorney all of the options in his case, including discussing any defenses to the charges (*id.*). Petitioner indicated that he had read and that he understood the plea agreement. (*Id.* at 6.) Counsel then summarized the plea agreement. (*Id.* at 6-8) Petitioner agreed that this summarization was accurate. (*Id.* at 8.) Petitioner stated that no one had made any threats or promises, other than those in the plea agreement, in an effort to get him to plead guilty. (*Id.* at 10.) The Court then informed Petitioner of the maximum penalty he faced by pleading guilty, which Petitioner indicated he understood. (*Id.* at 10-12.) The Court further explained to Petitioner what the advisory sentencing guidelines were and how they would operate in this case. (*Id.* at 12-13.) The Court further advised Petitioner of the elements of the offense (*id.* at 16), the Government's burden of proof (*id.*), and his right to a trial by jury (*id.* at 14). Petitioner thereafter pled guilty and admitted under oath that he was, in fact, guilty. (*Id.* at 16.) Petitioner also indicated that he understood that by pleading guilty he admitted each of the elements of the offense. (*Id.* at 16-17.) The Court then found that Petitioner was "fully competent and capable of entering an informed plea, that he under[stood] the nature of the charges and the consequences of this plea, and that his plea of guilty [was] knowing and voluntary." (*Id.* at 17.)

Additionally, the Government filed a written factual basis (Docket Entry 17) containing each of the essential elements of the offense, including a discussion of Petitioner's prior felony and his possession of the firearm. After discussing this filing with Petitioner and his attorney,

the Court found that Petitioner's plea was supported by an independent basis in fact.[2] (Docket Entry 33 at 20.) In short, Petitioner's plea was both knowing and voluntary.

## B. Petitioner Is a Felon.

In a supplement to his § 2255 motion, Petitioner claims that his plea was invalid because he was not a felon, citing *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011). (Docket Entry 46 at 9.) In *Simmons*, the Fourth Circuit addressed the method for determining whether a prior conviction is considered a "felony" conviction punishable by a term in excess of one year. *Simmons*, 649 F.3d at 243-245. The decision in *Simmons* dealt directly with prior convictions under North Carolina's Structured Sentencing Act, which sets out ranges of possible minimum sentences for all classes of felonies. *See* N.C. Gen. Stat. § 15A-1340.17. The table is organized by offense class and criminal history category, further divided into mitigated, presumptive, and aggravated ranges. The minimum sentences set out in that table correspond to maximum sentences set out in a second table. Under *Simmons*, a crime is "punishable" by the highest sentence that could have been given to a defendant convicted for the same class of felony who had the same criminal history as the Petitioner, sentenced in the presumptive range unless a finding was made to apply the aggravated range. *Simmons*, 649 F.3d at 243-245.

Here, Petitioner had a prior "conviction for Felony Sell/Deliver Schedule II Controlled Substance [which] is a Class G Felony, and [his] Prior Record Level was I, resulting in a

---

[2] In his reply, Petitioner also essentially asserts that his guilty plea was unknowing and/or involuntary because he was deprived of the newly acquired evidence that his federal defense counsel should have uncovered. (Docket Entry 61 at 2-3, 5-6.) As explained below, however, none of Petitioner's grounds for relief, in any of their permutations, have merit and nothing about the purportedly newly discovered evidence warrants granting Petitioner any relief. *See infra* at 23-39.

presumptive imprisonment range with a maximum penalty of 16 months . . . ." (PSR, Docket Entry 64 at 9.) Under the test set forth in *Simmons*, Petitioner's conviction was punishable by imprisonment for a term exceeding one year, and consequently a felony for purposes of federal law.[3] Beyond this, the Fourth Circuit has repeatedly rejected the approach endorsed here by Petitioner of looking at the sentence actually imposed rather than the one a defendant faced. *United States v. Sellers*, 806 F.3d 770, 775 (4th Cir. 2015); *United States v. Valdovinos*, 760 F.3d 322, 324-27 (4th Cir. 2014); *United States v. Kerr*, 737 F.3d 33, 38 (4th Cir. 2013); *United States v. Swann*, 526 Fed. App'x 265, 267 n.2 (4th Cir. 2013) ("Swann appears to argue that, because his sentence was suspended, it did not qualify as a predicate offense. However, a qualifying predicate felony is one for which Swann himself could have been sentenced to a prison term exceeding one year. It is not required that Swann was actually sentenced to serve (or did in fact serve) over one year.") (citation omitted). Because Petitioner here faced a maximum penalty of sixteen months of imprisonment, the conviction qualifies as a felony drug offense.

---

[3] *See, e.g.*, *Williams v. United States*, No. 1:06CR28-1, 2014 WL 3882207, at *1 (M.D.N.C. Aug. 7, 2014) (unpublished) ("Here, Petitioner's 2002 North Carolina conviction for sell/deliver cocaine was a Class G felony and Petitioner had a criminal history level of I . . . . [A] defendant in Petitioner's position could have been given up to 16 months of imprisonment. Under *Simmons*, Petitioner faced more than a year in prison and his predicate offense remains a felony. Therefore, Petitioner is still properly classified as a career offender, even after *Simmons*. Respondent's Motion to Dismiss should be granted and Petitioner's § 2255 Motion should be dismissed.") (citations omitted); *Brooks v. United States*, No. 1:10CR71-1, 2014 WL 12729150, at *1 (M.D.N.C. June 26, 2014) (unpublished) ("Petitioner's prior conviction for common law robbery was a Class G felony and Petitioner had a criminal history level of I . . . . The corresponding maximum sentences ranged from 12 to 16 months. Therefore, a defendant in Petitioner's position could have been given up to 16 months of imprisonment. Under *Simmons*, Petitioner faced more than a year in prison and this predicate offense remains a felony.") *rec' adopted* Slip Op. 1:10CR71-1 (M.D.N.C. Nov. 26, 2014) (unpublished).

### C. Petitioner Possessed the Firearm.

Possession of a firearm sufficient to establish a violation of § 922(g)(1) may be actual or constructive. *United States v. Pearson*, 221 F. App'x 212, 217 (4th Cir. 2007). Actual possession is defined as physical control over property. *Id.* A person has constructive possession of an item if he knows of its presence and exercises or has the power to exercise dominion and control over it. *See id.* Here, Petitioner next contends that he never possessed the firearm and that he "tossed it [the firearm] into [the] woods shortly after disarming his attacker." (Docket Entry 44 at 9.) Petitioner also asserts that counsel was ineffective at sentencing by agreeing that Petitioner took the firearm from the officer and then kept it. (Docket Entry 46 at 19.) Neither of these arguments have merit.

These allegations are directly contradicted by Petitioner's sworn testimony at his Rule 11 hearing. At that hearing, Petitioner's attorney informed the Court that "[w]e don't dispute that Mr. Riley did leave with the firearm and took that with him," and that Petitioner "does admit that he did take the firearm and went off with it, and it hasn't been returned." (Docket Entry 33 at 19.) The Court then asked Petitioner if he agreed, and Petitioner agreed with this assessment. (*Id.* at 20.) At the time, Petitioner was under oath. (*Id.* at 3.)

Nor was the Rule 11 hearing the only admission to the Court that Petitioner took the officer's firearm. At sentencing, counsel argued against an enhancement for the robbery and assault by claiming that Petitioner took the gun because of "self-defense." (Docket Entry 36 at 4-5, 29.) This Court specifically asked Petitioner's counsel, "[d]id he leave with the gun?"

-11-

(*Id.* at 4.)  Petitioner's counsel acknowledged, that yes, "[h]e left with the gun, but not with the intent to rob . . . ." (*Id.*)  Petitioner was present and did not dispute this statement.

Moreover, as the Court found at sentencing, the texts and calls recovered from Petitioner's phone indicated "communications with others that is supportive of the fact that [Petitioner] left with the officer's firearm, and [Petitioner] had asked a third party to retrieve firearms." (*Id.* at 14; *see also infra* n. 23.) Ultimately the Court found that, "[t]he [Petitioner] left with the officer's badge and his handcuffs and took the officer's firearm. The firearm has never been found." (Docket Entry 36 at 13.)  Petitioner actually possessed the officer's firearm by taking it from the scene.  He admitted this under oath; counsel did not err in stating the same.

### D. Petitioner's Possession Was in or Affecting Commerce.

Petitioner further asserts that his attorney was ineffective on appeal for failing to argue that his taking of the gun did not affect interstate commerce. (Docket Entry 44[4] at pdf page 23.)  The factual basis filed at the time of Petitioner's Rule 11 hearing notes that a firearm and nexus expert with the Bureau of Alcohol, Tobacco, Firearms, and Explosives determined that the officer's firearm had been manufactured outside of North Carolina. (Docket Entry 17 at 8-9.)  At the time of his guilty plea, Petitioner had no objection to this portion of the factual basis. (Docket Entry 33 at 17-20.)  Nor does Petitioner allege in his instant § 2255 motion that the firearm was not manufactured outside of the State of North Carolina.

---

[4] Petitioner inconsistently numbers the pages in this pleading. The Court will refer to the pdf page number in the footer appended upon docketing via the CM/ECF system.  (Docket Entry 44.)

-12-

It is well-established that if a firearm has travelled in interstate commerce sometime prior to its possession by a defendant, the jurisdiction requirement is satisfied. *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001) ("[T]he Government may establish the requisite interstate commerce nexus by showing that a firearm was manufactured outside the state where the defendant possessed it."). Thus, Petitioner cannot now challenge jurisdiction, or meaningfully claim that his attorney was ineffective for failing to do so.

**E. Sentencing Enhancements**

Petitioner also seems to be contending, as one of his sub-grounds for relief, that he is "actually innocent" of his sentencing enhancements. (Docket Entry 44 at pdf page 9.) However, Petitioner's guilt of violating 18 U.S.C. § 922(g), which as described above was conclusively determined at his Rule 11 hearing, is different from his culpability for assaulting and robbing Officer Stewart. The latter are guideline enhancements found at sentencing, and affirmed on appeal. In his § 2255 motion, Petitioner conflates the two when he claims "actual innocence," by citing *United States v. Maybeck*, 23 F.3d 888 (4th Cir. 1994). (Docket Entry 44 at pdf pages 9, 12.) *Maybeck* deals with an exception to a rule of procedural default; not a substantive innocence claim. *Maybeck*, 23 F.3d at 891-95. Moreover, Petitioner's efforts to attack his sentencing enhancements as to assault and robbery are foreclosed because they were previously considered and rejected. This Court found that the guideline enhancements related to assault and robbery applied (Docket Entry 36 at 14, 17), and that decision was upheld on

-13-

appeal by the Fourth Circuit. *Riley*, 600 F. App'x at 870-71.[5]  Petitioner is further barred from challenging errors in the application of the guideline enhancements for assault and robbery, as guideline error is generally not cognizable on collateral attack. *United States v. Foote*, 784 F.3d 931, 940 (4th Cir. 2015).

Beyond this, to the extent Petitioner attempts to raise these issues again in the guise of ineffective assistance of counsel claims, his efforts still fail.  Counsel did challenge these enhancements at sentencing and Petitioner denied committing the assault and robbery. (Docket Entry 34 at 7-9; Docket Entry 21.)  However, the Court found "that the defendant did rob the officer and did it with the possession of a firearm, which would constitute robbery under North Carolina General Statute 14-87(a).  The support for that includes the cases cited by the Government: *State v. Maness*, 677 S.E.2d 796; *State v. McMillan*, 214 N.C. App. 320." (Docket Entry 36 at 15.)  This finding was challenged and affirmed on appeal by the Fourth Circuit.  *Riley*, 600 F. App'x at 870-71 ("Because Riley's conduct, as found by the district court, constituted robbery under North Carolina law, *see North Carolina v. Maness*, 363 N.C. 261, 677 S.E.2d 796, 810 (2009), the court properly applied the base offense level for USSG § 2B3.1.").

Petitioner contends too that he is not responsible for discharging the firearm. (Docket Entry 44 at pdf page 10.)  Counsel made this argument at sentencing. (Docket Entry 34 at 7-9; Docket Entry 21.)  The Court noted that Petitioner's "argument is that he did not discharge the firearm; the officer did." (Docket Entry 36 at 15.)  This Court found "by a preponderance

---

[5]  If the Court could reconsider Petitioner's arguments, it would still deny them for the same reasons it gave earlier and for the reasons the Fourth Circuit gave on appeal.

of the evidence that [Petitioner's] conduct contributed to the firearm being discharged, that but for [Petitioner's] conduct, the firearm would not have been discharged. The officer directed [Petitioner] with words to the effect of 'Stop or I will shoot,' and [Petitioner] concluded that he would reach for the officer's arm and weapon in an attempt to force it away from him, if not to take it; and even under those circumstances, [Petitioner] contributed to the situation where, during the struggle, the firearm was discharged."[6] (*Id.* at 15-16.)

In applying the enhancement for assaulting an officer, this Court found "that [Petitioner] did create a substantial risk of serious bodily injury in a number of ways, one of which was the driving away. The other was the altercation, but during the course of the altercation, he assaulted the officer. He did that before the firearm came into play, and he did it after the firearm came into play by putting the cartridge back in and pointing it at the officer." (*Id.* at 17.) The Fourth Circuit subsequently upheld these findings and enhancements. *Riley*, 600 F. App'x at 870-71. *See, e.g.*, *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) (explaining that a criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]"). As a result, Petitioner's claims of "innocence" as they relate to the assault and robbery should be summarily rejected.

---

[6] To the extent Petitioner objects to the Court's use of a preponderance standard in making its findings at sentencing, that argument is unpersuasive. It is well-established that "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as th[e] Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008).

## **Ground Two**

Next, Petitioner asserts that counsel was ineffective prior to his plea, at sentencing, and on appeal. (Docket Entry 43, Ground Two; Docket Entry 44 at pdf pages 14-15.) Here, as explained throughout this Recommendation, none of Petitioner's allegations of ineffective assistance of counsel are persuasive. First, Petitioner faults his attorney for filing a motion to continue the trial. (Docket Entry 44 at pdf page 15.) This motion for a continuance, which the Court granted as meritorious (Docket Entry 16), is not evidence of ineffective assistance. Nor can Petitioner now complain about the scope or depth of his pre-plea discussions with his attorney, when at a subsequent Rule 11 hearing, Petitioner told the Court that he had discussed possible defenses with his attorney. (Docket Entry 33 at 5.) He also affirmed for the Court that he had "fully discussed the charges in the indictment and the cases in general" with his attorney and had "fully explored all the options" in his case. (*Id.*) Petitioner told the Court that he was satisfied with his attorney. (*Id.*) These sworn statements are a formidable bar to his current claim that his counsel was ineffective.

Petitioner also asserts that his attorney unlawfully induced him to plead guilty by advising him that he did not have a valid justification defense and by telling him that he faced twenty years of imprisonment if he went to trial. (Docket Entry 44 at pdf page 16.) Neither of these claims constitutes ineffective assistance. As explained below, Petitioner did not have a valid justification defense. Moreover, by pleading guilty, Petitioner—whose guideline range was later determined to be 292 to 365 months (Docket Entry 36 at 21-22)—capped his sentence at 120 months instead of the 240 months he faced had he been convicted of both

-16-

counts at trial. *See* 18 U.S.C. § 922(g)(1), 18 U.S.C. § 922(j), and 18 U.S.C. § 924(a)(2); Docket Entry 64, ¶ 50; U.S.S.G. § 5G1.2(d) (2012). Petitioner's attorney cannot be said to be ineffective for providing him with an accurate assessment of his statutory exposure.

Petitioner also claims that "[i]t did not occur to defense counsel to challenge the indictment for failure to demonstrate that the Grand Jury heard evidence." (Docket Entry 44 at pdf page 16.) This allegation is conclusory and unsupported by any facts which would suggest that such a claim had merit. *See Nickerson*, 971 F.2d 1125, 1136 (4th Cir. 1992), *abrog'n on other grounds recog'd*, *Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999). Petitioner goes on to fault his attorney for not challenging the indictment on the ground that "the two charges violated the *Blockburger* rule." (Docket Entry 46 at 15 referencing *Blockburger v. United States*, 284 U.S. 299 (1932).) This is not a persuasive argument. In upholding a conviction for felon in possession of firearms, 18 U.S.C. § 922(g)(1), and possession of stolen firearms, 18 U.S.C. § 922(j), the Fourth Circuit has held that "the separate sections of § 922 under which [the defendant] was convicted each require proof of different elements, thereby satisfying the *Blockburger* test." *United States v. Moye*, 454 F.3d 390, 397 (4th Cir. 2006). Petitioner further faults his attorney for not raising a *Simmons* claim. (Docket Entry 46 at 15.) As noted, *Simmons* provides no relief for Petitioner.

Petitioner also argues that his counsel was ineffective for failing to call a particular expert, David Coultier, as a witness at sentencing. (Docket Entry 44 at pdf pages 21-22; Docket Entry 46 at 9-11, 20-21.) Counsel had sought out an expert in police procedures and use of force, and at sentencing presented evidence favorable to Petitioner by way of a written

-17-

report detailing his expert's findings. (Docket Entry 43, Ground 2; Docket Entry 21 at 5, Ex. 2.) As Petitioner's counsel points out by way of affidavit, the expert's findings were presented to the Court in written form, and that "[t]his uncontested written testimony was highly favorable to the defendant." (Docket Entry 57, Attach. B at 2; *see, e.g.*, Docket Entry 36 at 5-6, 28.) Further, the decision not to call the expert as a witness was tactical, and designed to avoid the risks associated with cross-examination. (*Id.*) This tactical decision was not ineffective assistance.

Finally, Petitioner claims that his attorney acted ineffectively on appeal for not raising the Fourth Amendment, self-defense, and commerce clause arguments. (Docket Entry 44 at pdf pages 22-23.)[7] As explained throughout this Recommendation, these arguments have no merit. Petitioner was and remains a convicted drug felon. He possessed a gun, which he took from an officer. In the course of possessing the firearm, he robbed and assaulted the officer. Defense counsel negotiated a favorable plea which substantially reduced Petitioner's exposure from his otherwise applicable 240 month statutory sentence. Defense counsel then adequately represented Petitioner's interests at sentencing and on appeal. Petitioner has failed to show that counsel was constitutionally ineffective.

---

[7] Petitioner also contends that counsel was ineffective for failing to include in the appellate record "[t]he sealed report of police procedural expert, David Coultier" and "the audio interview with Officer Stewart," both of which are "extremely important exculpatory evidence." (Docket Entry 61 at 21.) Both of these exhibits were before the Court at sentencing. (Docket Entry 21, Ex. 2; Docket Entry 35 at 2, 52-53.) There were also included in the record on appeal. (*United States v. Carlos Antonio Riley, Jr.*, 14-4266, Docket Entry 18 at 143 & 228.) Consequently, this argument has no merit.

-18-

## Fourth Amendment

Petitioner also asserts a Fourth Amendment claim, asserting that "Officer Stewart did not have a reasonable, articulable factual basis for detaining and then attempting to physically seize Mr. Riley." (Docket Entry 44 at pdf page 4.)  Petitioner claims further "[t]he traffic stop was illegally extended and unreasonable when Officer Stewart lunged into the car."[8] (*Id.* at pdf page 6; *see also id.* at pdf page 3 ("Every action Officer Stewart took after frisking Mr. Riley was objectively unreasonable.").)  For the following reasons, none of these arguments have merit.

As an initial manner, Petitioner, by virtue of pleading guilty, may not raise an independent claim of a violation of his Fourth Amendment rights.  *See Tollett*, 411 U.S. at 267. Moreover, any effort at raising the Fourth Amendment issue in terms of ineffective assistance of counsel also fails.  More specifically, at sentencing, Officer Stewart testified that he conducted a traffic stop after observing Petitioner driving in an unsafe manner.  ((Docket Entry 24 at 6) ("[T]he vehicle sped off, spinning tires, going sideways down Forest Road").) This Court credited Officer Stewart's testimony and found that "as the vehicle sped off and, according to the officer, going sideways, the officer put his lights on and stopped the vehicle . . . ." (Docket Entry 36 at 11.)  Because Officer Stewart's credible testimony established that Petitioner made an unsafe movement (N.C.G.S. § 20-154)[9] and drove recklessly (N.C.G.S. 20-

---

[8]  Petitioner also faults counsel for failing to reserve his right to appeal the question of whether Officer Stewart violated his Fourth Amendment rights.  (Docket Entry 61 at 8.)  However, as explained above, there is no potentially viable Fourth Amendment claim.  Consequently, omission of this issue on appeal was reasonable.

[9]  *See, e.g., Grimm v. Watson*, 233 N.C. 65, 67 (1950) ("Under the statute codified as G.S. s 20-154, any person who undertakes to drive a motor vehicle upon a highway must exercise reasonable care to ascertain that such movement can be made in safety before he turns either to the right or the

-19-

140(a)-(b)),[10] Officer Stewart was justified in conducting a traffic stop. Petitioner admits as much when he states that "[i]f the car actually fishtailed, it was a violation that called for a warning or citation." (Docket Entry 44 at pdf page 5.)  *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Petitioner also failed to articulate any unlawful delay in the duration of the stop. Before Officer Stewart completed the stop, Petitioner committed new crimes, described above, by fleeing, resisting, assaulting, and then robbing Officer Stewart.[11]  In fact, Petitioner's attorney

_____

left from a direct line. Besides he is required by the same statute to signal his intention to turn in the prescribed manner and for the specified distance before changing his course 'whenever the operation of any other vehicle may be affected by such movement.' A motorist violates G.S. s 20-154 . . . if he fails to observe either of these statutory precautions in changing the course of his vehicle upon the highway . . . ."); *Badders v. Lassiter*, 240 N.C. 413, 418, (1954) ("And the statute G.S. s 20-154 also requires that before starting from a stopped position and moving into the line of traffic the driver shall first see that such movement can be made in safety"); *Beasey v. State*, 823 N.E.2d 759, 761 (Ind. Ct. App. 2005) (unsafe start present where defendant spun wheels and fishtailed).

[10] In fact, in his audio interview, Officer Stewart stated that he initially stopped Petitioner because of his reckless driving, that is, spinning tires, "fishtailing," and driving too fast. (Docket Entry 35, Defendant's Ex. 3.)  *See, e.g., State v. Duncan*, 244 N.C. App. 777 (2016) (affirming stop for reckless driving where "(1) Defendant 'revved up' his truck's engine and spun the tires; (2) his vehicle then swerved to the right with the rear end 'fishtailing' and the left tire coming off the ground; (3) Defendant's tire slung gravel; and (4) pedestrians and other vehicles were within approximately five to ten feet of Defendant's truck."); *State v. Floyd*, 15 N.C. App. 438, 440 (1972) (concluding that endangerment to one's own property or person sufficient to constitute danger to person or property necessary for reckless driving conviction).

[11] *See, e.g., United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) ("If a suspect's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime.'") (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1983) (noting that resistance to even an unlawful arrest is a sufficient and independent ground for a second arrest for a new, distinct crime)); *see also United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002) ("[A] direct, unbroken chain of causation [from a Fourth Amendment violation] is necessary . . . to render derivative evidence inadmissible.").

-20-

acknowledged to the Court that during the stop "[t]he officer had basis to restrain Mr. Riley." (Docket Entry 35 at 61; *see also* Docket Entry 57, Attach. B, ("Defendant's driving actions was [sic] a violation that called for a warning or citation thereby justifying a stop. Additionally, Defendant's behavior upon being stopped continued to arouse a reasonable suspicion that criminal activity on the part of the Defendant was afoot.").)

Finally, "suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations." *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007). However, the present case is not a case where an officer, for example, stopped and frisked a suspect without justification and during that violation of the suspect's Fourth Amendment rights, discovered a firearm. Here, the firearm attributed to Petitioner was one that he admittedly took from Officer Stewart. Moreover, although Petitioner has and continues to argue self-defense, that claim lacks merit for the reasons set forth below. For all these reasons, there is no meritorious Fourth Amendment argument here.

## Justification/Self-Defense

Petitioner further asserts his possession of Officer Stewart's firearm was justified by self-defense. (Docket Entry 44 at pdf page 12.) Again, by virtue of his guilty plea, Petitioner has waived the right to bring this claim. *See Tollett*, 411 U.S. at 267. Moreover, even if this ground was recast in terms of ineffective assistance, it would still fail.

More specifically, to be entitled to the defense of justification for a § 922(g) offense, a defendant must show that he:

> (1) was under unlawful and present threat of death or serious
>     bodily injury;

-21-

(2) did not recklessly place himself in a situation where he
would be forced to engage in criminal conduct;

(3) had no reasonable legal alternative (to both the criminal act
and the avoidance of the threatened harm); and

(4) a direct causal relationship between the criminal action and
the avoidance of the threatened harm.

*United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989).

Here, Petitioner has not made the requisite showings. First, Petitioner was not under
an unlawful and present threat. Officer Stewart had conducted a lawful traffic stop and was
attempting to detain a resisting suspect. As the Court noted, the incident did not involve "any
person. It is a law enforcement officer who is licensed to carry a gun and charged with
enforcing the law, and you have a situation that's escalated." (Docket Entry 36 at 9.)

Second, there was no unconditional threat to Petitioner. After being dragged by
Petitioner's fleeing car and fighting with him, Officer Stewart drew his weapon and ordered
Petitioner to get back or he would shoot. (Docket Entry 24 at 9-14 ("I moved -- it started to
move, and I was dragged. So I jumped on, I guess, the doorframe and inside the driver's door,
trying to hang on.").) As Court noted

> [t]he officer did not say, I am going to shoot you, and the officer
> did not pull the gun out and point it at him and remain silent. He
> said, 'Stop or I will shoot you' . . . . It was conditioned, and Mr.
> Riley then was given the choice of stopping without any threat of
> being hurt, according to the officer's command, or if he didn't
> stop, then he had the threat of being hurt.

(Docket Entry 36 at 7.) As is apparent from the facts found by the Court, Petitioner recklessly
or intentionally placed himself in the situation which led to his criminal conduct.

-22-

Third, Petitioner had numerous legal alternatives that would have avoided his possession of Officer Stewart's firearm altogether. For example, Petitioner could and should have acquiesced to the police officer's lawful orders. Instead, Petitioner attempted to flee a valid traffic stop, after the office told him that he was not free to leave. (Docket Entry 24 at 8-9; Docket Entry 36 at 11.) Petitioner said "hell no," and resisted when Officer Stewart took out handcuffs to detain him. (Docket Entry 24 at 11; Docket Entry 36 at 12.) Petitioner lunged at the officer after being ordered back. (Docket Entry 24 at 13-14; Docket Entry 36 at 12.) After unloading and gaining possession of the firearm, Petitioner offensively re-loaded the firearm, chambered a round, and pointed the firearm at Officer Stewart. (Docket Entry 24 at 16-17; Docket Entry 36 at 12-13.) As the Government argued at sentencing, "there is no reason to put the firearm back together and rearm a disarmed firearm at that point. Nobody is threatening you at that point in time. Nobody is trying to kill you. If you have a weapon and it's disarmed, the only reason to put it back together is to indicate your intent to use it." (Docket Entry 35 at 76-77.) Petitioner then took the firearm and has never returned it. (Docket Entry 36 at 13.) None of these actions are consistent with a valid self-defense claim. *See Crittendon*, 883 F.2d at 330.

Petitioner did not pursue this weak claim of self-defense at trial. Instead, he opted to accept a plea deal which limited his statutory exposure. As Petitioner admitted at his Rule 11 hearing, this decision was made after discussing with his attorney whether or not he had any

defenses to the charges in his indictment. (Docket Entry 33 at 5.) In short, Petitioner's justification/self-defense argument has no merit.[12]

### *Brady* Claim

Petitioner further contends that the Government suppressed discovery in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* Docket Entry 47 at 6-7.) Specifically, Petitioner claims that the Government suppressed a "Gunshot Residue Analysis Information Form" which was completed by Durham Crime Scene Investigator ("CSI") Marilyn Coble in connection with a gunshot residue test performed on Petitioner and Officer Stewart. (*Id* at 6-7, 9; *see also* Docket Entry 57, Attach. C.)

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The prosecutor's duty to disclose such exculpatory evidence is applicable even in the absence of a request for the information by the accused. *United States v. Agurs*, 427 U.S. 97, 110–11 (1976). *Brady* encompasses evidence known to police investigators, even if it is not known to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

---

[12] Petitioner also faults counsel for failing to cite case law in support of his defense. (Docket Entry 43, Ground Two; Docket Entry 61 at 9.) Given that there was no meritorious self-defense argument here, any failure on counsel's part to cite case law was, at most, harmless. To the extent Petitioner references some other unnamed defense theory, his claim fails for being vague, conclusory, and speculative. *See Nickerson*, 971 F.2d at 1136. Beyond this, Petitioner has failed to set forth any claim that has any likelihood of success. Counsel's failure to research, raise, and argue meritless legal claims cannot be ineffective assistance of counsel.

-24-

To show a *Brady* violation, a petitioner must establish three things. First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Second, the evidence must have been willfully or inadvertently suppressed by the state. *Id.* at 282; *see also United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). Finally, prejudice against a petitioner must have resulted (*i.e.*, the evidence at issue was "material"). *Strickler*, 527 U.S. at 282; *see also Stokes*, 261 F.3d at 502. Evidence is "material" and thus subject to *Brady* disclosure "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Petitioner contends that "[b]ecause the State/Government failed to disclose this material to Mr. Riley's federal defense attorney prior to the sentencing hearing, the constitutional error requires a new sentencing hearing with the inclusion of this information." (Docket Entry 47 at 7.) However, the form at issue was disclosed prior to the sentencing hearing. Consequently, there was no *Brady* violation.

More specifically, according to the Government, CSI Coble filed a written report detailing her actions which was turned over to the defense with the initial discovery. (Docket Entry 57 at 32.) The Government asserts further that, at the time discovery was initially provided, the GSR swabs as well as the laboratory submission form were at the North Carolina State Crime Lab for testing. (*Id.* at 33.) However, the Government continues, prior to the federal sentencing hearing on January 8, 2014, it obtained and provided to the defense the entire file of the Internal Affairs ("IA") investigation which resulted from the incident

-25-

involving Petitioner. (*Id.*) The Government supports this assertion by pointing to a discussion between the Government, defense counsel, and the Court on the record at the January 8, 2014, federal sentencing hearing, which appears to discuss an internal affairs file. (*Id.* at 33; Docket Entry 35 at 3-6.) The Government asserts that the disclosed IA file contained the laboratory results of the GSR test including the submission form Petitioner now claims was not disclosed. (Docket Entry 57 at 33.) In further support, the Government points to an email between it and federal defense counsel, dated December 9, 2013, in which the Government notes that the IA file had been disclosed. (Docket Entry 57 at 33, Attach. D.) This email also included scanned portions of the IA file in an attachment labeled "12092013151736.pdf," which shows that the IA file included the North Carolina State Crime laboratory report. (*Id.*) In short, Petitioner has failed to demonstrate that any evidence was suppressed.

Moreover, even if the form had been suppressed, it is not material. Petitioner alleges that this form is exculpatory because it says, "1 shot fired by officer." (Docket Entry 47 at 5). Petitioner's trial attorney addressed this claim in his affidavit, saying that:

> Also in his motion, Defendant implies that there was exculpatory evidence regarding the gun discharge and accompanying gunpowder residue. Such evidence was not exculpatory as there was no question during the case, interviews and witness testimony that officer Stewart was holding the firearm when it discharged . . .

(Docket Entry 57, Attach. B at 1-2.)

Petitioner's attorney is correct. At sentencing. Officer Stewart testified as follows:

> Q What did you say to the defendant?

-26-

A I pulled my gun from my holster, and I told him that if he didn't get back, I was going to shoot him.

Q Did the defendant comply?

A No.

Q What did the defendant do at this point?

A At that point he lunged for my firearm.

Q And where was the firearm at this point in time?

A It was in my right hand.

Q Was the defendant able to touch the firearm?

A Yes.

Q What happened?

A He was able to touch it, and then at that point, we began to scuffle over my handgun.

Q Describe the scuffle for me.

A Like I told you, he grabbed it, and then I was trying to bring it towards me to get full possession of it.

Q During this struggle, did the firearm discharge?

A Yes it did.

(Docket Entry 24 at 13-14.)

Nor did the firearm have to be in Petitioner's hand. The guideline in dispute, U.S.S.G. §2B3.1(b)(2)(A), calls for an enhancement "[i]f a firearm was discharged." U.S.S.G. §2B3.1(b)(2)(A). At Petitioner's sentencing hearing, the Government cited *United States v. Henderson*, 48 Fed. App'x 455 (4th Cir. 2002) (unpublished). (*See* Docket Entry 35 at 77-79.)

-27-

In *Henderson*, the defendant and victim struggled over control of a firearm and the firearm discharged, wounding the defendant. The Fourth Circuit held that "even if the firearm in this case was not discharged by [the defendant]," the guideline enhancement was properly applied because the defendant "induced the struggle during which the shotgun was discharged, or at the very least, could reasonably foresee that the gun might be discharged during the home invasion." *Henderson*, 48 Fed. App'x at 456. *See also United States v. Roberts*, 203 F.3d 867 (5th Cir. 2000) (enhancement proper when officer fired during a fight for control over the weapon). This is consistent with the Court's finding that guideline enhancement applied, not because of who was holding the firearm, but because "the defendant contributed to the situation where, during the struggle, the firearm was discharged."[13] (Docket Entry 36 at 16.)

Petitioner also claims that newly discovered evidence from a witness, Brooks Hipes, requires a new sentencing hearing. (Docket Entry 47 at 5, 7.)  However, resentencing is not warranted here, because this witness was available at the time of the federal case and her testimony does not undermine confidence in Petitioner's sentence.  According to Petitioner's motion, the newly discovered evidence in this case is Ms. Hipes' testimony at his subsequent,

---

[13] Petitioner also refers to a workers' compensation claim filed by Officer Stewart in which he allegedly admits that he shot himself and which Plaintiff asserts was never "presented to the district court." (Docket Entry 61 at 4.)  He likewise mentions an "EMS report" which is also described as "exculpatory." (Docket Entry 46 at 8.)  Petitioner further faults counsel for failing to show the Court at sentencing a "mug shot" demonstrating injuries he suffered from his encounter with Officer Stewart. (Docket Entry 44 at pdf page 17.)  Petitioner has not presented this evidence and it is not in the record.  Assuming these documents exist, it is unclear exactly what they contain or why they might change the outcome of this case.  These are conclusory and unsupported allegations and fail for that reason alone. *See Nickerson*, 971 F.2d at 1136.  Beyond this, even if the workers' compensation claim contained such an admission, it would not exculpate Petitioner for the same reasons the GSR analysis failed to exculpate Petitioner.

-28-

related state trial that she saw Petitioner pointing a gun in the air but that she did not see the gun pointed "at the gentleman on the ground." (Docket Entry 47 at. 11.)

This is not a persuasive argument. First, Ms. Hipes was available and known to Petitioner at the time of his sentencing in the instant case. According to the Government, the initial discovery provided by the Government included two written statements by Ms. Hipes as well as a business card which included her contact information. (Docket Entry 57 at 36-37 & Attach. E.) These statements were also included in the IA file subsequently given to Petitioner prior to sentencing. (Id., Attach. D (showing that the IA file included as "Exhibit E" two pages of written statements by Brooke Hipes).)

Second, Ms. Hipes' statements make it clear that she did not see much of the interaction between Petitioner and Officer Stewart. Ms. Hipes was only alerted to the confrontation by the sound of a gunshot. (Id., Attach. E.) After glancing out the window and seeing Petitioner holding a gun, she stepped away from the window to tell her co-worker to call 911. (Id.) Given these gaps in her observations, her later testimony that she saw Petitioner holding a gun, but did not see him point the gun at the officer, does not undermine confidence in Petitioner's guilt, which Petitioner himself admitted by virtue of his guilty plea, or the sentence imposed by this Court, which was affirmed on appeal.[14]

_____

[14] If Petitioner is contending that counsel was ineffective because he advised Petiioner to plead guilty despite the existence of the GSR report, the Hipes' statement, or (as discussed below) the Mance affidavit/report (or the statistics upon which it apparently relies), that argument fails. Had Petitioner rejected the plea agreement and gone to trial he almost certainly would have been found guilty of both being a felon in possession of a firearm and of being a felon in possession of a stolen firearm. The statutory maximum sentence here was 240 months (ten years for each conviction) and, as explained above, Petitioner's guideline range was 292 to 365 months of imprisonment. 18 U.S.C. § 922(g)(1), 18 U.S.C. 922(j), and 18 U.S.C. § 924(a)(2); Docket Entry 64, ¶ 50; U.S.S.G. § 5G1.2(d) (2012).

**Petitioner's Reply**

In his reply, Petitioner alleges for the first time the existence of additional evidence which purportedly came to light in his subsequent, but related, state proceeding. (Docket Entry 61 at 12-14.) He argues that this evidence should have been provided to him in this federal case. (*Id.* at 14.) More specifically, Petitioner alleges the existence of

> information about Officer Stewart's misconduct in violating North Carolina Police Department General Order Policies regarding traffic stops under general policy 4074 R2, and City of Durham Training Department Policies for Based [sic]-Based policing. Furthermore, this discovery material [ ] would also show that Officer Stewart was racial profiling through traffics stops of African-Americans almost 80% of the time.

(*Id.* at 13.) Petitioner then quotes a portion of a transcript from his state trial in which his state attorney references an "SBI-122" and unspecified "statistics." (*Id.* at 13-14.) Petitioner contends that had he known of this evidence prior to his federal sentencing hearing, he would have moved to withdraw his guilty plea. (*Id.* at 14.)

The Court ordered additional briefing on this issue. (Docket Entry 66.) The Government filed the requested briefing.[15] (Docket Entry 68.) Because the Government's

---

Consequently, had Petitioner rejected the plea agreement and gone to trial, he likely faced a twenty, rather than a ten, year sentence. No rational individual in such a position would have rejected a plea agreement and gone to trial in these circumstances.

[15] Although Petitioner was afforded an opportunity to respond to the Government's supplemental briefing (Docket Entry 66 at 4), he did not. Instead, Petitioner filed a motion requesting an evidentiary hearing with no argumentation in support of why a hearing would be warranted. (Docket Entry 70.) Petitioner has failed to provide any meaningful reason for an evidentiary hearing and the Court does not see one. Consequently, this motion is denied.

-30-

briefing on this issue is well-supported and provides additional relevant context, the Court

quotes it at length:

> The Petitioner's reply references "information about Officer Stewart's misconduct in violating North Carolina Department General Order Policies regarding traffic stops under general policy 407 4 R2, and City of Durham Training Department Policies for Based [sic]-Based policing." (Docket Entry 61 at 13). This appears to be a reference to the Durham Police Department's "General Orders."
>
> The Durham Police Department maintains a manual of "General Orders" which contain "the general policies and philosophies of the Durham Police Department." Manual, Forward, p. 2 (2018). This document is publicly available, and the current version can be found online at: (https://durhamnc.gov/DocumentCenter/View/20944/GO-Manual---Feb-2018). One of these General Orders, Number 4074 R-3, entitled "Bias Based Policing," outlines the Durham Police Department's commitment to be "fair and impartial in law enforcement practices." It instructs that "[o]fficers of the Durham Police Department shall treat all people with whom they have contact equally and without regard to their race, gender, ethnicity, religion, age, citizenship, sexual orientation, political persuasion or any other stereotype." *See* Order, included as Attachment A. The basis of the Petitioner's claim that the officer violated this general order appears to be the statistics Petitioner references immediately afterwards.
>
> North Carolina maintains a database of information about traffic stops, the contents of which are public record and readily available online. *See* N.C.G.S. § 114-10.01 (1999) (currently codified at N.C.G.S. § 143B-903) (included as Attachment B). This dataset includes detailed information on more than 22,000,000 traffic stops that have occurred in the state since North Carolina law enforcement officers began reporting their data in 2000. *See generally*, North Carolina Traffic Stop Statistics, N.C. DEP'T OF PUB. SAFETY, http://trafficstops.ncsbi.gov/Default.aspx.

Under this state program, law enforcement officers anonymously report data about their traffic stops, which is collected and maintained by the North Carolina Department of Public Safety. *See* N.C.G.S. § 143B-903. Information collected includes the race, age, and gender of drivers and passengers who are stopped; the reason and general location of the stop; and information relating to searches, citations, arrests, uses of force, and contraband seizures that might occur in the course of the stop. *Id.* These reports are made on a form called an "SBI-122," an example of which is included as Attachment C.

By state law, every law enforcement officer who submits data "shall be assigned an anonymous identification number." N.C.G.S. § 143B-903(d). An officer's identification number is not public record and may only be disclosed subject to a court order. *See* N.C.G.S. § 143B-903(d) ("The correlation between the identification numbers and the names of the officers shall not be a public record, and shall not be disclosed by the agency except when required by order of a court of competent jurisdiction to resolve a claim or defense properly before the court.").

In this case, the federal indictment was returned in 2013, and the written judgment issued in 2014. (Docket Entries 1, 27). Almost a year later, as part of a state proceeding, the Petitioner filed a motion in Durham County Superior Court requesting the SBI-122 form filled out in relation to his case and the disclosure of the officer's identification number. On February 5, 2015, Superior Court Judge James Roberson, Jr., held a hearing on this motion. Petitioner Riley, his attorney, the state prosecutor, and the attorney for the Durham Police Department (Toni Smith) were all present. At this hearing, the police attorney represented to the state court that no SBI-122 form existed for the defendant's case. *See* Transcript, Attachment D ("MS. SMITH: Correct. Our written objection has multiple reasons why if we had it, I don't think we're required to produce it. But in order to save the Court some time, the bottom line is there is no report in this case to produce."). At this hearing, the court declined to order the disclosure of the officer's identification number, but did order the release of data related to the officer's stops. *See* Transcript, Attachment E ("THE COURT: . . . So what I am

-32-

going to do is I am going to order that the records from January 1, 2011, to the date of offense be produced . . . .").

The state defense team appears to have taken the data received pursuant to this court order to an individual named Ian Mance, who prepared a statistical report. *See* Transcript of State Suppression Hearing, Attachment G ("the affidavit of Ian Mance, our expert, and it incorporates the SBI-122 forms that were ordered produced and a database . . . it's the basis for -- part of the basis for Mr. Mance's opinion.") and Attachment H ("Ian Mance took what the City gave us, and there's no expert saying this was wrong, and there is no expert saying it's wrong because it's not wrong. So for that 2011 to December 18th, 2012, Officer Stewart stops African Americans 67 percent of the time. It's a little bit different -- 76, I'm sorry."). This appears to be what the Petitioner referred to in his reply when he stated that "information . . . would also show that Officer Stewart was racial profiling through traffics stops of African-Americans almost 80% of the time." (Docket Entry 61 at 13).

This witness was not called to testify in Petitioner Riley's state trial. Indeed, Riley did not offer any evidence. *See* Transcript, included as Attachment I. Even though Riley had Ian Miller's statistical report, as well as all of the information he now asserts was suppressed in his federal case, he chose to plead guilty to the state charge of possession of a firearm by a convicted felon, which was the mirror of the instant federal charge. *See* Transcript, included as Attachment J. In doing so, Riley admitted his guilt and the possession of the officer's firearm. (*Id.*).

(Docket Entry 68 at 4-7 and Attach. A-I.) For the following reasons, this additional line of

argumentation, raised for the first time in Petitioner's reply, warrants no relief.[16]

---

[16] The Government argues that any new claims in the reply are time-barred or have been otherwise waived. (Docket Entry 68 at 8.) Although Respondent's arguments concerning the timeliness of Petitioner's new claims may have merit, they involve a complicated assessment. The potential claims set forth in Petitioner's reply present no such difficulties. Moreover, the limitation period is not jurisdictional, so the Court need not consider it before proceeding to other arguments. *See Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir. 2002).

**A. The Claims in Petitioner's Reply Fail on the Merits.**

Regarding a potential *Brady* claim, Petitioner asserts that "discovery material" was suppressed "that shows that Officer Stewart was racial[ly] profiling through traffics stops of African-Americans almost 80% of the time." (Docket Entry 61.) As noted above, this appears to reference the report/affidavit created by Ian Mance at the request of the state defense attorney that purportedly concluded that 76% of the officer's traffic stops involved African Americans. As demonstrated above, this report did not exist until after the federal case had concluded, and was never in the possession of the federal prosecution team.[17]

Further, the data from which his state defense team generated these statistics, contained on the SBI-122 forms documenting every other traffic stop the officer conducted,[18] was not in the possession of the federal prosecution team. In this case, the Government asserts—and there is no evidence to the contrary—that the federal prosecution team did not possess the SBI-122 forms documenting information about every other traffic stop made by the officer in unrelated cases. This information was collected by a state entity unrelated to the federal investigative team and was protected from disclosure by state law, which required a court order

---

[17] The Government cannot suppress information it does not have in its possession. *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."); *United States v. Hsieh Hui Mei Chan*, 754 F.2d 817, 824 (9th Cir. 1985) (government "has no duty to volunteer information that it does not possess or of which it is unaware").

[18] The Court agrees with the Government (Docket Entry 68 at 6, n.2) that the logical reason that Officer Stewart did not complete routine paperwork in this case was the fact that he was shot and hospitalized. His role was that of a victim and not an investigator. Further, this statement is consistent with the officer's testimony at the federal sentencing proceeding that he did paperwork on other incidents, but did not complete any reports on this incident. (*See* Docket Entry 24, pages 22-23.)

-34-

to access. The Government here was not in control of the state agency for purposes of this case.[19] Nor was the Government required to seek out this information.[20]

In addition to the fact that the Government did not possess the SBI-122 forms, Petitioner has failed to show that the raw information on these forms is itself exculpatory or impeaching.[21] Nor has Petitioner established that the federal prosecution team possessed and suppressed information that the officer violated a general order. To the contrary, in this case, the Government obtained a full copy of the report of the Internal Affairs ("IA") investigation

---

[19] *See, e.g., United States v. Salyer*, 271 F.R.D. 148, 156 (E.D. Cal. 2010) (unpublished) ("The need for formal process in the acquisition of documents is the antithesis of 'access' as defined by the [case law].""), *opinion adhered to as modified on reconsideration*, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) (unpublished); *Buchanan v. Beard*, No. CIV. 10-0423 GPC NLS, 2013 WL 2390435, at *16 (S.D. Cal. May 29, 2013) (unpublished) (rejecting claim in § 2254 proceeding that state violated *Brady* by failing to disclose witness's prison records which defendant speculated would contain impeachment information and reasoning that "records maintained by the California Department of Corrections and Rehabilitation (CDCR) in the regular course of business are not available without a court order, and as such they were not in the possession of the prosecutor").

[20] *See, e.g., United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010) ("Courts have routinely refused to extend *Brady's* constructive knowledge doctrine where doing so would cut against the agency principles underlying imputed knowledge and would require prosecutors to do full interviews and background checks on everyone who touched the case . . . . [I]t is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case.") (citations omitted); *Horton v. United States*, 983 F. Supp. 650, 654 (E.D. Va. 1997) ("[T]here is no 'duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.'"); *United States v. Lee Vang Lor*, 706 F.3d 1252, 1259 (10th Cir. 2013) ("We do not think prosecutors have a duty to investigate officers' actions in entirely unrelated cases just in case some impeaching evidence may show up.").

[21] *See Foster v. Tandy Corp.*, 848 F.2d 184, at *5 (4th Cir. 1987) ("[R]aw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value."); *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) ("[A]bsent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim . . . . [T]here is not a presumption that unexplained statistical evidence of racial disparity proves racial animus.") (citations and quotation marks omitted).

related to the incident and turned it over to federal defense counsel. *See* Docket Entry 22 (Government's motion stating IA file had been disclosed and moving court for a protective order for same). If the police department had made a finding that the officer violated a general order, it would have presumably been disclosed as part of this file.

Finally, even if the Government had suppressed favorable impeachment evidence in its possession, Petitioner still has not carried his burden to show materiality. As explained, evidence is "material" within this context if there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *Bagley*, 473 U.S. at 682. In this case, Petitioner asserts that had he known of this evidence prior to his federal sentencing hearing, he would have moved to withdraw his federal guilty plea. (Docket Entry 61 at 14.) His actions demonstrate otherwise. At the time of his state prosecution, Petitioner had all of the information he now claims was suppressed in his federal case. In spite of this he chose to plead guilty to an identical charge of possession of firearm by a felon in state court. (Docket Entry 68, Attach. J.) This state court guilty plea to the same offense, based on the same conduct, underlying his federal conviction shows that the result of the federal proceedings would not have been different. There is no meaningful *Brady* claim here.

### B. Petitioner's Proposed Ineffective Assistance Claim Has No Merit.

Any ineffective assistance of counsel claim alleging a failure to investigate racial profiling would also fail. First, as noted, the Mance report involving Petitioner did not exist until after the federal case had concluded and so counsel could not have been ineffective in failing to uncover it. Second, it was objectively reasonable for Petitioner's counsel to focus

-36-

his efforts on arguments related to the officer's use of force and application of guideline enhancements, rather than on a selective enforcement claim. The Fourth Circuit has held that "although an officer's 'motive[ ] for stopping an automobile that was violating traffic laws is irrelevant to the legitimacy of the stop under a Fourth Amendment analysis, . . . racially motivated law enforcement can violate the equal protection component of the Fifth Amendment's Due Process Clause.'" *United States v. Hammond*, 353 F. App'x 877, 879 (4th Cir. 2011) (quoting *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996)); *see also United States v. Suarez*, 321 F. App'x 302, 305 (2009) ("Allegations of racially motivated law enforcement implicate the Equal Protection Clause rather than the Fourth Amendment.").

Yet, as the Fourth Circuit has explained, such a claim is difficult to prove:

> The Constitution "prohibits selective enforcement of the law based on considerations such as race." *Whren* [v. *United States*], 517 U.S. [806,] 813, 116 S.Ct. 1769 [(1996)]. . . . This court has adopted the standard the Supreme Court set forth in *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), for cases of racially animated law enforcement. *See United States v. Bullock*, 94 F.3d 896, 899 (4th Cir.1996). The defendant must show both "discriminatory effect and that [the officer's action] was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). Both the Supreme Court and this court have explained why this is a difficult contention on which to prevail. A selective law enforcement claim "asks a court to exercise judicial power over a special province of the Executive." *Id.* at 464, 116 S.Ct. 1480 (internal quotation marks omitted). In light of "the great danger of unnecessarily impairing the performance of a core executive constitutional function," petitioners must demonstrate "clear evidence" of racially animated selective law enforcement. *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996).

-37-

This "standard is intended to be a 'demanding' and 'rigorous' one." *Id.* (quoting *Armstrong*, 517 U.S. at 463, 468, 116 S.Ct. 1480). . . . To show discriminatory effect, petitioner must demonstrate, *inter alia*, that "similarly situated individuals of a different race" were not similarly targeted by law enforcement. *Olvis*, 97 F.3d at 743 (quoting *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480). Here, for example, there was no evidence of similarly situated whites being treated differently. *See Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480 ("[I]f the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently.").

*United States v. Mason*, 774 F.3d 824, 829-30 (4th Cir. 2014).

Consequently, the aforementioned statistics alone are immaterial to the Fourth Amendment issue. Moreover, any Equal Protection argument regarding selective enforcement was unlikely to succeed, if for no other reason that there is no evidence alleged or on the record that is likely to demonstrate that persons of other races were not stopped by Officer Stewart for same offending conduct for which Petitioner was stopped. And in any event, even assuming that Officer Stewart's initial stop of Petitioner was racially animated this still would not excuse Petitioner's possession of the firearm in this case or his assault and robbery of Officer Stewart.

Fourth, even assuming counsel was objectively unreasonable in failing to pursue the question of racial profiling, Petitioner has failed to demonstrate any likelihood that but for the purported error, he would have gone to trial. By his own admission, at the time of his state prosecution, Petitioner had all of the information he now claims was suppressed in his federal case. (Docket Entry 61 at 12-15.) In spite of this, he chose to plead guilty in state court to possession of a firearm by a felon. (Docket Entry 68, Attach. J.) *See also State v. Riley*, 802 S.E.2d

-38-

494, 496 (N.C. Ct. App. 2017) (noting that Petitioner pled guilty to possession of a firearm by a felon in state court). This state court guilty plea to an identical, or nearly identical, offense based on the same conduct underlying his federal conviction shows that the result of the federal proceedings would not have been different.

Fifth, had Petitioner withdrawn or rejected the plea agreement and gone to trial he very likely would have been found guilty of both being a felon in possession of a firearm and of being in possession of a stolen firearm. Even if Officer Stewart's credibility were somehow damaged at trial by the above-mentioned statistical evidence, the other evidence of Petitioner's guilt of both possession of a firearm by a convicted felon and possession of a stolen firearm by a convicted felon would have been overwhelming.[22] The statutory maximum sentence here was 240 months (ten years for each conviction) and, as explained above, Petitioner's guideline range was 292 to 365 months of imprisonment. 18 U.S.C. § 922(g)(1), 18 U.S.C. 922(j), and

_____

[22] Police interviewed a contact on Petitioner's cell phone, "Rude Boi," who said that Petitioner had called him the morning of the incident and told him he had gotten in a fight with an officer and taken his gun from him. (Docket Entry 17 at 5.) Rude Boi told police that Petitioner asked him to go get two guns, his gun and the officer's gun, but that he declined because his vehicle had bad tags and he did not want to be driving around with weapons. (*Id.*) Petitioner's friend, D.P., was with him when he was arrested. (*Id.* at 6.) D.P. told law enforcement that Petitioner admitted to him that he had taken the officer's gun and "hidden" it. (*Id.*) After his arrest, Petitioner's first call from jail was to his girlfriend and father. In this call, Petitioner asked his girlfriend to "ask my daddy did he find what I needed him to?" Petitioner's father then got on the line and Petitioner said, "Did you find what I needed you too?" and "I need you to go grab it for me." (*Id.* at 7-8.) Officers also spoke to two witnesses. One reported seeing a black male wearing a black shirt or vest holding a handgun in his right hand and pulling a black male wearing a light colored shirt out of a red vehicle. (*Id.* at 3-4.) This witness, B.H., yelled for a second witness, J.M., to lock the door and call 911. (*Id.* at 4.) Both witnesses reported seeing the man wearing the light colored shirt lying in the roadway, holding his leg. (*Id.*) Both witnesses also reported seeing the man wearing the black shirt or vest back the red vehicle part of the way out of the complex, stop for a minute, and then continue driving away. (*Id.*) When found, Detective Stewart was wearing a light grey long sleeve shirt. (*Id.*) Detective Stewart's badge and handcuffs were found in the public bathroom near the pool at an apartment at which Petitioner would stay along with a black shirt. (*Id.*) (*See also* Docket Entry 35 at 25-39; Docket Entry 64 at ¶¶ 6-8.)

-39-

18 U.S.C. § 924(a)(2); Docket Entry 64, ¶ 50; U.S.S.G. § 5G1.2(d) (2012). Consequently, had Petitioner rejected the plea agreement and gone to trial, he faced a potential twenty, rather than a ten, year sentence. No rational individual in such a position would have rejected a plea agreement and gone to trial in these circumstances. For all these reasons, Petitioner does not have a viable ineffective assistance of counsel claim here.

### Motion for the Appointment of Counsel

Petitioner has also filed a motion requesting the appointment of counsel. (Docket Entry 50.) There is no constitutional right to appointed counsel in a habeas case. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013); *Hunt v. Nuth*, 57 F.3d 1327, 1340 (4th Cir. 1995). Under 28 U.S.C. § 2255 and 18 U.S.C. § 3006A, the Court, in its discretion, may appoint counsel if it "determines that the interests of justice so require." 18 U.S.C. § 3006A(a)(2). Appointment of counsel is also required if discovery is otherwise authorized and counsel is needed for effective discovery or where an evidentiary hearing is to be held. *See* Rules 6(a) and 8(c) of the Rules Governing Section 2255 Proceedings in the United States District Courts. Petitioner has not set forth good cause for any such appointment and justice does not require it. Given that all Petitioner's claims fail for the reasons set forth elsewhere herein, this motion is denied.[23]

**IT IS THEREFORE ORDERED** that Petitioner's motion to appoint counsel (Docket Entry 50) and motion for evidentiary hearing (Docket Entry 70) are **DENIED**.

---

[23] One of Petitioner's supplements also contains a request for discovery. (Docket Entry 47 at 8.) Nevertheless, Petitioner has failed to demonstrate good cause why discovery is appropriate in this case. Consequently, the request for discovery is denied.

-40-

**IT IS RECOMMENDED** that Petitioner's motion to vacate, set aside or correct sentence (Docket Entry 43) be denied and that this action be dismissed.

_____
Joe L. Webster
United States Magistrate Judge

October 30, 2018
Durham, North Carolina